Thank you. If it pleases the court, good morning. My name is Charles Talbot. I represent Linda Garner. This is another Social Security case. This is a situation where Ms. Garner was found disabled by the judge at Step 3 of the sequential evaluation process. And then going through it again using the drug and alcohol assessment, found that Ms. Garner, in the absence of drug and alcohol use, would not be disabled. And found her capable of doing past work at Step 4 and other work at Step 5. One of the concerns in this case is that the ALJ put most of her attention and most of her consideration into the opinions of the DDS doctors who evaluated the case at the agency level. They're not treating doctors, they're simply reviewing doctors. And correspondingly, what she did is rejected most of the treating medical evidence. One of the things that's of major concern to myself in the case is directly related to the testimony, not the testimony, but the report of Dr. Copeland. Now, what the ALJ essentially did is take Dr. Copeland's face-to-face assessment of Linda and changed the outcome. And she's not medically trained to do that. Now, Dr. Copeland put some pretty severe restrictions on her, including marked inability to deal with the public, marked inability to deal with the pressures of a workplace situation. And what she did is she didn't compare Dr. Copeland's assessment with anybody else, just reached inside Dr. Copeland's assessment and drew different conclusions from his assessment. Now, I have to assume that Dr. Copeland is a competent psychologist and did a competent psychological examination. He's an expert. And unfortunately, we see this all too often, where we see ALJs using the same facts and evidence as an examiner and then coming to different conclusions. Now, this is not a situation where the judge is weighing evidence from two different doctors and giving an opinion that Dr. A is more believable than Dr. B. Now, one of the things that was cited by counsel in a letter to the court was the Britain case that was decided this year. We don't believe the Britain case is applicable to this case, and here's why. In the Britain case, there was testimony from a medical expert at the hearing, and he testified at Step 3 that he thought the claimant met a listing from fibromyalgia. And then at Step 5, he said, or the RFC was, that she could perform light work. And this is obviously inconsistent. And besides, the court said fibromyalgia is not a listing-level impairment. This is a different situation. This is a situation where a judge is only looking at one piece of evidence. There's no inconsistency in that piece of evidence, and yet she's making a medical judgment for which she's not trained to make. Well, before we get too far along, just what is the standard that the ALJ must use in rejecting the opinions of the treating physician? Well, I don't know that there's any articulable standard in order to— Well, here's what I saw. I mean, it seems to me that if you're going to, if you will, disregard what the examining physician, Dr. Copeland, said, you've got to give some bona fide reasons for doing that, and they've got to be straight and clear. I looked at what the ALJ said. The ALJ said, Dr. Copeland only provided conclusions in a checkmark form, with a checkmark on a form without any explanation or citation to objective medical findings. Then I looked at Melina, and you can discount the treating physician for that. The ALJ said Dr. Copeland's assessed limitations were brief and superficial contact with the public and inability to handle work stress to be inconsistent with Garner's existing activities. I look at the case law. As long as that's what they find, then you can reject. So, I guess, then the second last part of it was, when we got to the RFC, it seemed like the ALJ did use some of the things that Dr. Copeland had said in formulating the RFC. So, I'm still having a tough time, since you're going to focus right on Dr. Copeland, why the ALJ erred in doing what Dr. Copeland, or doing what it did with Dr. Copeland. Well, I'll answer the question three ways. But before I do that, let me just say, we picked Copeland, because if you go through all of the medical evidence, Copeland, Dr. Sandra Elsner, Dr. Thompson, Sandra Bertolo, Angela Ballas-Sotis, Leanne Allen, and Elsner and Allen, the judge essentially rejected everything. And I have, I'll address that. But as far as... Well, if you want to take on the other ones, I'll be glad to go through. I'm just saying, you started out with Copeland, so I said, okay, I want to go to my notes on Copeland, and I did. And I saw exactly what the ALJ said, and then I looked at the law that I used to say, that's a good reason for rejecting what Copeland did, and now I'm having you respond. All right. Coming to the three responses to your question. First of all, Copeland's not just a checkbox form. Dr. Copeland wrote extensive notes on that form in support of his diagnosis. Secondly, if the ALJ felt that it was deficient, there's a rule that says that if there's a deficiency in conclusions, the ALJ has an obligation to recontact that source and ask for an explanation as to why that's deficient. And the third thing is when the ALJ talks about her activities, like Bible studies and AA meetings and going to this MOMS program, et cetera, et cetera, et cetera, that's the nature of therapy. Now, what you have to look at is SSR 96-8P requires a person to have a capability of working eight hours a day, five days a week, on a consistent basis. Going to nightly AA meetings, which are relatively short, going to counseling sessions, doing Bible studies, is not 40 hours a week activity. It's bits and pieces here and there. And so we often see the citations to these kinds of activities, they're more in the nature of treatment sessions because she's recovering from drug use. It would be like saying, well, if a person go to physical therapy five days a week, they must be able to work. Well, that's not the same thing. This is treatment. This is recovery from her addiction. And while the ALJ cites these various activities, there's no link to full-time employment, which is required under the regulations, like I just cited. Did I answer your question? You did. I'm not sure, given what deference or lack thereof, I have to give to the ALJ if that's sufficient, but I understand at least your answer. Okay. Well, I just want to make sure I answered your question. Whether you agree or not is what I'm doing. Well, I don't know. I'm going to let the government respond. Okay. There is also a question raised about the MRFC form and the fact that there's one part of the form that's like a checkbox form where the person doing the reviewing checks off different limitations, and then Section 3 where there's a more detailed explanation of the limitations that are expressed in Section 1. And there's a POMS on that that says that Section 3 is controlling. The problem here, and I don't disagree with that, the problem here is what happens when there's a checkoff on Section 1 that's not addressed in Section 3. And that was the basis for some of our questions to the VE in this case is, okay, if we assume certain limitations that are in Section 1 which are not discussed in Section 3, what effect does that have on the ability to work? And the VE's response is if we accept those limitations, a person cannot sustain work activity. I understand your argument. I guess my only response to that is it seems to me that what the ALJ has to do is use the narrative that's in Section 3 in the RFC rather than a checkbox in 1. And I found that the—and I think this is what the government's responding—the ALJ properly did that, used everything in Section 3. Well, I understand. They're always going to say that. My point is this, and I don't disagree if there's a match in Section 1 with Section 3. I have no issue with that. What my issue is is when there's something in Section 1 that doesn't show up in Section 3. Do you ignore it? I don't think so. You have to deal with it. It's like your last case where— What case do I have which says that I have to do that because I look for what? I don't think that issue has come before the court before. Okay. Then I—you're exactly the same place I was. I couldn't find it. I could find that the Commissioner's Program Operations Manual System suggests if they don't put everything in Section 3, then they don't have a proper hypothetical for the VE. But I don't have anything that says if there's a checkbox portion in one, that if they don't include that, they're wrong. So you're asking me to do that? What I'm essentially saying, if there's an indication of a presence of a limitation in Section 1 that's not addressed in Section 3, the effect of what the Commissioner's argument is, well, we just ignore that. We don't have to pay attention to that. That's exactly the argument. And we're saying, no, you can't do that. Okay. Thank you for your explanation. And lastly, we'll touch on the— Just a minute. Judge Gould, I think— I was just wondering if you were going to hold time. I'm sorry? Are you going to reserve time? Two minutes. And the last is the drug and alcohol assessment. It's our position, and we detailed this extensively in the brief, that the state agency doctors really didn't address the issue of meeting a listing based on alcohol or not. The judge found there was a listing that was met based on a finding of 1204, 1206, and 1209, and then proceeded to say, well, in the absence of her drug use, she wouldn't be disabled. The problem is, again, I think this is a medical judgment. It's required to—she needs to consult with an expert who can render that opinion as to whether or not the 1204 and the 1206 disorders would still be disabling in the absence of the 1209, and particularly given the statement in the SSR that says that the agency knows of no data that can support the absence of D, A, and A, how it would affect other mental disorders. The thing—being involved in this a little—not very much, but a little bit, I guess my question was, it seems to me you're arguing that the ALJ had to get an expert to help do this. Why didn't you provide an expert? Well, when you're dealing with people— I mean, you bore the burden, and now you want the ALJ to do it, but why didn't you provide the expert if you thought it needed to be done? When you're dealing with people like this, you can't afford it. They can't afford to call doctors in. It's that simple. It's an economics issue. This is not like a civil trial. This is a different situation. And because the bottom line is, it seems to me that a non-examining expert would not have been any better than having a non-examining expert who assesses an RFC. Well, you know, what you have here is kind of— this is sort of indirectly responding to that, is you have an ALJ who essentially rejected all treating and examining sources, but then relied on agency doctors for their opinions, whose opinions were based on the same medical information that the ALJ rejected. And if she's rejected essentially all that information, then how good is the agency opinions in the absence of considering the medical evidence that they looked at? Well, I understand, but my worry is that, first of all, non-examining experts are not high on our ones we're going to look at and make their expertise that which is the most essential. And we had a non-examining expert who assessed the RFC, and all you're really asking for is another non-examining expert to come in and testify as to this particular issue. What I'm saying is that an ALJ is not in a position to make medical judgments when there's a decision made that a person meets a listing based on drug and alcohol use. And we have an agency statement saying, we don't know if we remove drugs or alcohol from the mix, how that would affect co-occurring or comorbid mental health problems. They make a very specific distinction in the SSR between comorbid physical and comorbid mental, to make that very clear. And by the way, coming back to your comment, the agency on page 37 of their brief said that an ALJ may permissibly reject checkoff reports that don't contain any explanation of the basis of their conclusions. That's the same problem we have with the MRFC form. We have a checked box with no discussion. Thank you. Thank you, counsel. Counsel, your time is up, but I'm going to give you your two minutes. Thank you. But I do want you to address one question first that I'm going to ask Ms. Griffith. Do we have a Ninth Circuit precedent that sets a standard that makes clear how an ALJ is supposed to approach taking the impact of alcohol and drug use out of the equation when someone's been determined to be disabled with the drug use or alcohol use, but now the ALJ is going to try to do a revised calculation? Is there a clear rule as to how that's to be done? Well, the court rendered the Bustamante case, which talked about process. And that process was once you've determined that a person has been found disabled, if drug or alcohol abuse is part of that, you have to go through this process again to do a reassessment, this time without the impact of drug and alcohol abuse. That was before the SSR was enacted and the statement by the agency saying, we have no way of knowing if you take alcohol or drugs out of the equation how it impacts other mental health conditions. And they talk later in that SSR about requiring an expert, a medical person, to testify on that issue. Then there's no precedent that says whether your client has the burden of hiring that expert or the SSA has the burden. That's correct. And there's no precedent that talks about the impact of SSR. Thank you. Ms. Griffith, could I ask you to respond to the question I just asked Mr. Talbott before you start smoking on all your arguments that you have organized? Yes, Your Honor. Bustamante is the precedent that he refers to. I'd also direct the court to PARA. I'm afraid I don't have the citation in front of me, but in PARA it does say that the burden of proof is with the claimant in showing that the drug and alcohol use was not material to the finding of disability. The agency enacted 13-2P fairly recently after the ALJ made this decision, but the agency has stated that it is a reflection of our policy that doesn't represent a change in the policy. And in 13-2P it discusses that the best evidence of a claimant's level of functioning absent drug and alcohol use is a period of sobriety. And we have that in this case.  There's some inconsistency in when the period of sobriety actually started, but there's no evidence that the claimant used drugs after February 2009. The SSR 13-2P says that some of the evidence that we will look to is the evidence of the claimant's testimony and the lay statements suggesting what the claimant's level of functioning is. Ms. Garner engaged in extensive activities. She attended Bible study twice a week. One study had 40 women. One had 10 people. She attended two AA meetings and a sponsor meeting. And not only did she attend these meetings, but she chaired these meetings. The claimant testified that she gets very nervous when she's around people. She didn't like going to check her mail in her large apartment complex if there was too many people milling around. And she said she would get these anxious feelings five times a week. Yet she was able to use coping mechanisms to attend all of her Bible studies and AA meetings. The claimant counsel alleges that these are part of her treatment and we shouldn't penalize her for attending her treatment. But this level of activity is inconsistent with her statements. She stated that she tries to be really involved in these groups. In 2009, her husband reported that she attends them all the time, several hours a day, several times a week. And further, she testified that she didn't like to miss many meetings and she never missed the meetings she chaired. She had to be there because she was in charge. Now, these activities are inconsistent with the limitations that Dr. Copeland assessed, that she had marked limitations in her ability to interact with the public, moderate limitations in her ability to relate with coworkers, and marked limitations in her ability to tolerate pressure in a normal work setting. If she can go to meetings even when she doesn't feel like it because she knows she has to be there because she's chairing a meeting, that is an indication that she doesn't have a marked limitation in her ability to tolerate pressures in a work setting. The ALJ reasonably discounted Dr. Copeland's opinions for this reason. As I understand it, certainly the claimant has the burden of proof to show disability. But if the agency has made a determination that there's disability with drug use and alcohol use, then is there no case from our circuit that focuses on that situation and says who has the burden then? I believe PARA does, Your Honor. Was it involving alcohol and drug use also? Yes, it was. I can submit the citation if you would like after I brief. It might have been in the briefs. Was it in your brief? I don't know off the top of my head. If you could submit the citation to Stacey. Ms. Garner also alleges that the ALJ did not properly deal with the Section 1 versus Section 3 of the PRFT form. I'd like to make a common sense argument about why. Before you jump into that, PARA is in your brief. Oh, great. 481 F. 3rd, 742, 2007 decision. It's right there in your brief. Great. I thought it sounded familiar. The state agency doctor in Section 1 of the form checked the box that the claimant had moderate limitations in her ability to complete a normal work week and moderate limitations in her ability to perform at a consistent pace. He also assessed the RFC of simple instructions and procedures, few changes in the workplace routine, and some social limitations. We don't know what the doctor was thinking when he filled out this box, but we could make an argument that the ability to complete a normal work week is moderately limited, but if we keep her to simple instructions, then she can do it. Claimant seems to want the ALJ to play doctor and to look at every single checkbox and make sure that it is somehow exactly represented in the RFC. I don't believe we have the ability to do that. I think it is best left to the doctor and left, as agency policy states, to just follow what it says in Section 3 where they explain their conclusions. He has a whole page where he writes out what the clinician's notes that he's relying on, the claimant's written statements, and the lay statements that the agency doctors are relying on, and then states the conclusions for that. Does Council have any more questions? No. I'll sit down then. Thank you. Thank you, Council. While the burden is on the claimant at steps 1 through 4 to prove disability, this Court has held in many cases that an ALJ has an affirmative duty to develop the record, even in cases where the claimant is represented. And all we're saying is that in compliance with the SSR, it's the responsibility of the judge either to get evidence or testimony about the impact of removing drug abuse from the mix. We still have 1204 and 1206 present. And the fact that the claimant may have the burden doesn't relieve the obligation of the ALJ to develop the record. The counsel for the commissioner doesn't directly address the MRFC issue about if there's a check-off on the first section of the form as far as limitations of a claimant. What do you do if it's not expressed in Section 3? Essentially, the implication of their argument is we simply ignore it. I don't think you can. At least that's our position, and we've discussed that previously. The other issue is the argument by the commissioner is that it seems fairly clear that the claimant was drug-free, at least starting in February of 2009. After February of 2009, we have the assessment by Dr. Copeland in May of 2009. We have the assessment of Dr. Thompson in June of 2009. And we have the assessment of Lorraine Allen in October of 2009, all three of whom placed very severe restrictions, functional restrictions, on the claimant that if accepted would preclude a person from employment, all of which was rejected by the ALJ. If there's no questions, I'm done. Okay, thank you, counsel. Thank you, counsel. And the case of Garner v. Colvin is submitted. We thank both counsel for their fine arguments, and the court will adjourn until tomorrow.
judges: Hawkins, Gould, Smith